UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | NO. A-17-CR-0301 XR |
| | § | |
| **MICHAEL HERMAN (1)** | § | |
| CYNTHIA HERMAN (2) | § | |

**DEFENDANT MICHAEL HERMAN'S SENTENCING MEMORANDUM**

TO THE HONORABLE XAVIER RODRIGUEZ, UNITED STATES DISTRICT JUDGE,
FOR THE WESTERN DISTRICT OF TEXAS, SAN ANTONIO DIVISION:

NOW COMES defendant Michael Herman by and through undersigned counsel, and files the following sentencing memorandum.

**I.    Introduction.**

Michael ("Mike") Herman and his wife, Cynthia Herman, are both before the Court for sentencing following jury trial in this matter. The jury returned a verdict of guilty as to Mike Herman on Counts 1, 2, 3, 5, 6, & 7. It returned a verdict of not guilty on Count 4, finding the Hermans not guilty of charges of false statements on their personal tax return in 2012.

Mike Herman has shown to this Court—and also over the course of his adulthood, as outlined in the PSR—that he is a hard worker. He is not wealthy or powerful; after retirement from the Houston Fire Department he and his wife opened a business that was way beyond their skill set. They could not cope and made serious mistakes. Regardless of the outcome at sentencing, the Hermans will be convicted felons who are well over $500,000 in debt, between state and federal orders against them. Unlike so many fraud and tax clients in federal court, Mike Herman is not a tax protestor, and not someone who wants to make money without

working: he and Cindy will continue to work, to abide by the Court's orders, and to pay full restitution.

At the same time, the tax loss—a financial harm to the federal government—is the driving factor in sentencing. Under the defense analysis, that loss is slightly over $10,000. Per the government, that loss is slightly over $550,000. However, the tax loss figure propounded by the government incorporates taxes on income for which there is no evidence; and the tax loss on the income that is evident must be reduced under USSG § 2T1.1, cmt. n 3, because the Hermans' accountant actually caused them to report hundreds of thousands of dollars in bank transfers and loans as income, even though those things were not income. The amount of tax loss is critical to the harm in this case: the Hermans should not be punished for taxes that they didn't pay on income that they did not, in fact, earn. Due to the complexity of the tax loss, and its centrality to the 18 U.S.C. § 3553(a) factors in this case, it is addressed first in this memorandum. The remainder of the factors, including Mike's History and Characteristics, follow.

II. **The Offense Conduct Proven at the Jury Trial Should Not Be Substituted With Less Reliable Information Solely in Order To Increase the Tax Loss and Offense Level.**

A. **The Government Estimated the Tax Loss Before Jury Trial. It Has Since Adopted a Default Rate, Rather Than the "More Accurate Determination Of Tax Loss" It Made Before Trial.**

The government provided clear and simple tax loss amounts leading up to trial. They calculated a tax harm for criminal purposes of $126,470 based on approximately $600,000 in understated income and $94,000 overstated business expenses. Due to government recalculations in anticipation of trial, it actually reduced the amount of understated income to approximately $568,000. Applying the methodology used by the government, this would reduce

2

the amount of tax harm initially alleged to $109,392, *before* application of USSG § 2T1.1 cmt. n. 3, under which the Sentencing Commission requires the Court to account for any unclaimed credit, deduction, or exemption that is needed to ensure a reasonable estimate of the tax loss. That tax harm occurred in three areas: unreported sales; unreported income from vending machines; and falsely inflated business expenses.

Although the government's work product and methodology indicated a tax harm in these categories of $126, 470, which would necessarily be reduced downward based on its own adjustments, it has instead attempted post-trial to increase this portion of the tax loss to over $200,000. First, unlike before trial, the government is now ignoring its own Case Agent's estimate that the Hermans paid about $92,500 of unrecorded business expenses in cash. As discussed below, this initial estimate of theirs was low according to their own evidence. Second, the government ceased calculating the actual tax loss in this case based on the Hermans' actual tax rates at the time, and instead resorted to using the "default" tax rates of 28% and 34% respectively. This is explicitly allowed under 2T1.1, "unless a more accurate determination of the tax loss can be made." *See* USSG 1.1 2T1.1 Note A. The government's initial determination was more accurate. Thus a more accurate determination of the tax loss "can be made" because it has been made, by the government. *See* Michael Herman Sentencing Objections at 3-4.

### B. The Government's Calculations before Trial Should Be Adjusted for the Overreported Gross Receipts and Underreported Business Expenses.

The evidence the Hermans brought under USSG § 2T1.1 cmt. n. 3 mitigates the loss amount under principles established by the Sentencing Commission. While the Court precluded William D. Brown, the defense's expert, from testifying before the jury at trial as a legal matter, Brown did testify to the Court regarding the forensic analysis conducted. *See* William Brown

Direct, Trial Transcript 749-51.  He determined that the gross receipts reported by CPA Peden to the IRS—which was used by the government to calculate the tax harm for criminal purposes—improperly included over $409,000 in gross receipts.  *See* Trial Transcript at 751.  This was done when accountant Peden incorrectly included transfers and loan proceeds as revenue.[1]  CPA Brown confirmed that the numbers used by Peden—which *overreported* gross receipts—were adopted by the government, i.e., that the government had not already corrected Peden's errors. CPA Brown further made certain that Peden did not otherwise account for the $409,000 in overstated gross receipts, such that their tax liability was otherwise corrected.  *See* Trial Transcript at 752.  CPA Brown further testified as to his analysis, breaking it down by year and business, providing an explanation of his calculations and how showing how each adjustment to gross receipts/income was derived and documented.  *See* Trial Transcript 752-763.  To include this $409,000 as gross receipts/income, for taxes on which the Hermans are criminally liable would result in them receiving a higher sentence and greater restitution based on "income" that is demonstrably not "income," "gross receipts," or sales.

The government also offered testimony at trial that the Hermans falsely claimed $94,387 in business expenses.  In response, Mr. Brown offered evidence and testimony to the Court explaining that there were a significant number of legitimate business expenses that were not deducted.  His work, provided to the Court as Defendant's Trial Exhibits 1-6 (received but not admitted before the Jury), and to the probation office, indicated that the amount of business expenses that the Hermans' accountant failed to deduct was $44,949.  That is, while the Hermans

---

[1] The government's case agent Daniel Fannin agreed that transfers between bank accounts are not gross receipts and therefore should not be considered income.  *See* Testimony of Daniel Fannin, Trial Transcript 600.  For what it is worth, even though it was accountant Peden who made the errors regarding transfers, he too conceded that transfers between a business's two bank accounts are not gross receipts.  *See* Testimony of Greg Peden, Trial Transcript 394.

were convicted of falsely overstating business expenses by $94,387—a felony offense—over the same period of time their accountant failed to deduct $44,949 in valid business expenses. Evidence of this has been provided to the Court, both in the trial exhibits which were deemed not relevant to the jury, and most recently through the Hermans' "Tax Loss Calculation" Letter from Michael Herman, sent to the Court via the United States Probation Office on July 31, 2019.

The government also originally calculated additional legitimate deductions in the amount of $10,000 per year, per business, in tax-deductible business expenses paid by the Hermans' businesses in cash out of the till. As discussed below, and in the analysis provided to the probation officer on July 31, 2019, that additional $92,500 in unclaimed legitimate business expenses is in fact a conservative estimate made by Mike at the time the search warrants were executed. A more reliable data point created by Special Agent Dan Fannin would suggest twice that amount. The Hermans' CPA never deducted for cash expenses paid out of the till, nor did he request that the Hermans provide an estimate of that. Thus, documentary evidence shows that the tax harm based on inflating business expenses is actually *more than offset* by legitimate business expenses that were not deducted. *See* Tax Loss Analysis, July 31, 2019.

Based upon this work, further detailed in the loss amounts provided to the Probation Office on July 31, 2019, the Hermans have provided evidence to the Court that, properly accounting for adjustments, exemptions and deductions under USSG § 2T1.1, cmt. n. 3, the correct loss amount is $33,908. That includes $23,756 based solely upon acquitted conduct, leaving a tax loss in the amount of $10,152.

The evidence upon which this is based, and the analysis by William Brown, have been available to the government since before trial, which was in May. The government's case agent

identified virtually all of the same non-revenue items as Mr. Brown in his work: loan proceeds, bank transfers, and personal infusions of money into the businesses which the Hermans' accountant incorrectly reported to the IRS as "gross receipts/income."  The summary of the Hermans' position of the specific tax consequences based upon the required adjustments to the tax loss under USSG § 2T1.1, cmt. n. 3, were provided to the probation office and the government on July 31, 2019.  To date, the government has not provided any evidence to contradict this information.

Critically, with regard to the culpability of the Hermans as it relates to overstated business expenses on their tax returns (which was one of the grounds of falsehood for which the jury convicted them), reliable evidence indicates that *as a whole*, the Hermans actually understated their business expenses by at least $43,000.  *See* Tax Loss Calculation and supporting documentation, submitted to the Court via Probation Office on July 31, 2019.  This total accepts as proven (1) the government's overstated business expenses of $94,387; (2) the case agent's estimate of $92,500 in cash expenses paid by the businesses; and (3) additional adjustments to business expenses identified by the defense which come to $44,949.  The defense itemized and provided supporting evidence for each of these expense adjustments on July 31, 2019.  The government has not responded.

The estimate by Case Agent Fannin of cash expenses paid out of the till but not deducted by the Hermans appears to be very low, based on the government's own analysis of those expenses.  A later and more objective analysis of cash expenses paid out,  made by Case Agent Daniel Fannin shows that the estimate upon which the $92,500 in un-deducted business expenses paid out in cash was based—$10,000 per business per year—is too low.  Based on actual

business records seized from the Hermans, Agent Fannin began an analysis of cash expenses paid by the businesses. The figure paid out is closer to $20,000 per business per year. In an effort to be conservative when calculating tax loss for purposes of relevant conduct, the defense utilized the case agent's initial, lower figure. However, for purposes of determining the Hermans' culpability, the defense references the Case Agent's work in Appendix E, admitted at Trial as Defendant's Exhibit 12, which itemized payouts from the till for 68 days for one business. On average, Cindy's Downtown paid $56 per day from the till for bar-related expenses such as food, entertainment, and laundry. This amounts to $180,000 for nine years, and $5,000 for Cindy's Gone Hog Wild ("CGHW") in 2011, the year after the fire, for a total of $185,000 in business expenses that were paid, but not deducted.

### III.    The Government's *Additions* to Tax Loss after Trial Are Inaccurate and Unreliable.

After trial, the government not only changed its method of calculating the above tax losses to the "default" rate, it also added three additional categories that it claims caused additional tax harm: (1) underreported employee tips ($87,832), (2) "unidentified" cash sales that were not rung up ($151,200); and (3) state tax loss. None of these three were at issue or proven at trial, and the Hermans have filed objections to each.

With regards to **(1) underreported employee tips**, a critical fact for sentencing is that the Hermans were not enriched by this underpayment of tax by employees. As Agent Fannin stated in his Special Agent Report, since "the employees were leased from Pacesetter Personnel Services, the underreported tip income for employment tax purposes would be reflected on Pacesetter's employment tax returns." The taxpayer is not the Hermans, but rather the employees and Pacesetter.

With regard to **(2), the "unidentified" income alleged by the government,** the objections, the trial testimony, and the government's own interviews with employee witnesses demonstrate that the Hermans should not be held accountable for an additional $151,200 in taxes based on $540,000 of "ghost income." *See* PSR Objections of Michael Herman at 4-7. This increase of tax loss by $151,200 is based on a single statement by Mike Herman after Special Agent Dan Vela asked him:

> I guess as I'm running my numbers here can I just assume that I can add in another seventy-five hundred dollars a, a month that, you know, doesn't get rung up and I can add it to my calculations of what?

*See* PSR Objections of Michael Herman at p. 5. Mike agreed that Agent Vela could assume that, just as he told Agent Vela any number of fantastical things about the growth potential of the business: he was allowing a supposed buyer to "assume" what he wanted, including that the restaurants were producing more income than they actually were. To now require the Hermans to pay taxes and restitution—and do prison time—based upon a bare agreement that the Agent could "assume" there was more income would violate the principles of sentencing based upon conduct actually committed, as well as the requirement that the government prove factors increasing sentencing by a preponderance of the evidence.

With regard to **(3), the state tax loss,** the Hermans have provided the Court with objections indicating that the state tax audit amount includes conduct unrelated to the federal offense, and further relies upon erroneous work by the state auditors—work that contradicts the Government's own determinations of the gross receipts, revenue, and sales in this very case. *See* Response to the Government's Objections to PSR, dated 8/26/2019.[2]

## IV.    The Hermans regularly filed tax returns and paid taxes.

---

[2] These responded to objections filed by the Government on August 16, 2019.

Relevant to the Court's consideration at sentencing is the fact that the Hermans did pay taxes: they paid state sales tax, they paid a "mixed beverage" liquor tax, and they filed both Corporate and Personal Federal income tax returns. The Hermans are not tax protestors. Indeed, for his 21 years at the Houston Fire Department, *see* PSR at ¶ 59, Mr. Herman paid his federal, state, and local taxes. He also disclosed his $61,000 capital gain from the sale of a patent on a rear-view mirror invention to his CPA, such that it was properly reported as a Capital Gain for tax year 2009.

**V.     The Hermans are willing to pay restitution in the amount ordered by this Court.**

Perhaps most relevant to this Court's consideration at sentencing is the fact that the Hermans are fully willing to pay restitution in the amount ordered by this Court. They begin with a lump sum payment of $2,500, which he will pay by cashiers check that he brings to Court with an empty Payee line, awaiting the specific order of whom to make the check out to.[3]

The Hermans had initially hoped to pay $6,000 towards restitution at the time of sentencing. However, on June 20, 2019, Herman was terminated as a driver by Uber. He had up to that point regularly driven between 45 and 70 hours per week, summing to a total of over 150,000 miles driven. *See* Exhibit 1, records of Uber driving.[4] He was specifically terminated because of his conviction in this case. Cynthia Herman also had significant difficulties finding

---

[3] It is the experience of counsel that the clerk will not accept a payment towards restitution absent a specific order from the Court.

[4] Because Uber does not employ individuals, but rather hires them as independent contractors, it only provides weekly screenshots and end-of-year statements. Several of the weekly screenshots from 2019 are included. A portion of these weeks are summarized via an excel spreadsheet, to give an indication of the miles driven, the expenses, and the hours worked by Mike, broken down by week for the sample period of August 1, 2018—November 4, 2018.

long-term employment following being arrested and charged in this case. Nonetheless, she persevered and has been employed gainfully since well before the trial in this matter.

Mike Herman will earn money and pay back restitution, regardless of whatever setbacks come his way, as ordered by this Court. He obviously cannot make restitution payments from prison, and finding employment after being released from any prison sentence will be difficult.

## VI.    Mike Herman's History and Characteristics.

Mike Herman is before the Court a 60-year-old man charged and convicted of the first crime of his entire life. He worked for over twenty one years as a first responder in the State of Texas. His life has been dedicated to hard work and loyalty to friends and family.

### A. Performance on bond for two years, and challenges overcome while on bond.

Mike Herman was arrested for the first time in his life on September 7, 2017. He posted bond on conditions that day, and has been in 100% compliance with the conditions of his bond for a full two years. He is not a threat to the community: in the sense that he has never been arrested, charged, or convicted of a violent crime, a drug crime, or any other offense—felony or misdemeanor—other than the felony of which the jury convicted him here. He is also not a threat to the community in that—unlike the significant majority of those charged with fraud or tax schemes—Mike Herman has a lifelong history of legitimate, hard work, in the field of public service. He has never been accused of, charged, or convicted of any offenses similar to this one.

Since before his arrest, Mike worked for Uber, a ridesharing service, as an independent contractor. He began in July 2017 and worked through June 20, 2019. On that day, he was disconnected from the "app" which allowed him to work for Uber with the simple message that his "account needs attention." When he called Uber he was told that he been suspended and

could no longer drive for them. They told him to contact Uber's main office. The number they gave him was actually for "Chekr," a company that provides background checks for Uber and other app-based services. They told him that there were "unmanageable items" on his background check. He was unable to work for them from that date on.

By July 5 of this year, two weeks later, Herman had a job as a project manager for a small construction firm. He worked for them for a month, but quit when he discovered that they were engaged in subpar and unethical work, for example, carrying out major renovations without structurally stamped drawings by an architect or engineer. He resigned from that position on August 1, 2019.

While Mike Herman does not have a job right now, that is simply because no one will hire him with a pending sentencing date. However, his friend and colleague Johnny Phillips has indicated that, if he is not sentenced to imprisonment, he will hire him at his Wrecker Service. Mike will accept this job, and—in light of his 40+ year work history, including his two years on pretrial supervision—there is little doubt that he will remain employed during his term of probation.

Mike Herman has shown the Court that whatever conditions are set for him to accomplish the goals of sentencing, he will abide by those. He not only appeared before this Court and the magistrate for all pretrial hearings and trial, he has also dutifully reported to the pretrial services officer and held nothing back from her. He has worked extraordinarily hard at legitimate work, incurred no new troubles of a legal nature, and has remained close with his family and friends.

### B. Mike's Character.

Mike Herman's history of hard, traumatic, and sometimes dangerous public service work as a first responder speaks to his character. He worked for the Houston Fire Department for over 20 years. He joined at age 22. The following year, he trained to become a paramedic. He served as a paramedic in the field, and later was a dispatcher, a role in which he often had to guide private citizens or other first responders in emergency situations. He was eventually promoted to senior captain and served as an assistant to the Fire Chief, allowing him to continue serving by training and supervising the first responders of the Houston community. As a paramedic he delivered dozens of babies. He rescued a police officer from a burning car. He received a commendation for a particularly complicated resuscitation at the airport. *See* Exhibit 2, Commendation and Proclamation. Indeed, upon his retirement he received a proclamation stating that May 23, 2003 was "Michael John Herman Day" in the City of Houston "in appreciation of his dedication and loyal service in the proud tradition of the Houston Fire Department." *Id.*

Mike recounts memories of the especially gruesome or tragic deaths he witnessed in the field, including those of babies and children. To cope with the impact of those experiences his mantra was "just keep moving." Practices for first responders are different today in recognition of the fact that nearly 85% of first responders experience symptoms related to mental health issues. Indeed, 34% of first responders have been formally diagnosed with a mental health disorder, including depression and PTSD. Having started his career in 1980s, Mike never received therapy or treatment for trauma, secondary trauma, or post-traumatic stress disorder

which is so common in the field of first responders.[5]  Mike never resorted to drugs, violence, or criminality.

Instead, when Mike retired from HFD in 2003, he worked for a brief period in the field in Central Texas, then in security at Hyatt Lost Pines.  Then he and his wife opened the businesses CGHW and Cindy's Downtown.  At age 46, Herman was learning how to run a restaurant and working the grueling hours that were in evidence at trial.

In addition, Mike and Cindy's son Preston was found to have a brain tumor, and in 2007 underwent an intensive surgery to remove the tumor. The surgery took place in Houston, as did numerous pre- and post-operative appointments, so the family traveled back and forth frequently. The surgery was a success but it did leave Preston with some lingering deficits that continue to this day. Preston has always resided with Mike and Cindy and he continues to do so.

In 2009 Mike's sister Regina was diagnosed with cancer and underwent ongoing treatment for the next three years. It was during this time—in 2010—that the Herman's restaurant, Cindy's Gone Hog Wild, burned down in an electrical fire. In 2012 Patricia Stuart, Mike's mother, was diagnosed with a recurrence of cancer. She underwent surgery to remove part of her lung, in addition to chemotherapy. Her recovery was stressful and had Mike and Cindy traveling back to Houston frequently.  In December 2015 Mike's nephew Gregory, Regina's son, was run over and killed by a hit and run driver in Houston.

Mike has always been the lynchpin when anyone in his family—immediate relative or not—has needed him.  And most importantly to his family members, he has always been an extraordinarily hard worker who has overcome poverty and the difficult circumstances of being

---

[5] *See, e.g.*, https://www.securitymagazine.com/articles/90454-first-responders-and-ptsd

raised in a single-parent home.  *See* Exhibits 3, 4, 5, Character Letters from Kim Goldberg,

sister; Elwin Stuart, stepfather; Preston Herman, son.

Not only family members, but other members of the community speak highly of Mike

Herman.  His former colleague Chris Connealy was Fire Chief of the Houston Fire Department.

Mike served under him.  He describes Mike as having "served with distinction."  Mike played a

key role into a line-of-duty death investigation in which Mike showed:

> leadership so the fire department could learn from this horrible incident and incorporate
> lessons learned.  The outcome of this line of duty death investigation lead to numerous
> changes in the fire department.  Mike also created a PowerPoint that I could use when I
> went to the fire stations so the lessons learned from this investigation could be shared
> personally with firefighters in the organization.  Mike's service to the Houston Fire
> Department in his career and especially during this very difficult time after Captain
> Jahnke's death was outstanding.

*See* Exhibit 6, Letter of Chris Connealy.  Mr. Connealy also speaks of Mike on a personal level

as an "excellent huband, father, and friend.  I have always known him to help others when they

needed assistance."  *Id.*  Larry Franklin, a friend of 12 years, describes Mike as loyal, patriotic,

hardworking, and dedicated to his family.  He describes how Mike volunteered to go to NYC and

clean up after 9/11, but also how he drove back and forth to Houston from Bastrop every week to

get his son Preston the treatment he needed for his brain tumor.  *See* Exhibit 7, Letter of Larry

Franklin.

### C.  The Effects of a Felony Conviction.

Regardless of whether any prison time is imposed, Mr. Herman has been, and will

continue to be affected in the following ways:

1) **Publicly -** he has endured the public shame of charge, trial, and conviction; he will

   forever be marked as a felon in the eyes of society;

2) **Personally -** he has been under court supervision for two years;

3) **Financially –** he will be jointly and severally liable for restitution in the full amount ordered by this Court; and

4) **Politically/civilly –** he will be unable to vote during any period of imprisonment, as well as any period of probation; he will never be allowed to possess a firearm.

Under the 18 U.S.C. § 3553(a) factors, it is not *necessary* to imprison Herman.  *See United States v. Taffaro*, 919 F.3d 947 (5th Cir. 2019) (upholding sentence of 60 months' probation on tax evasion scheme, where Guidelines had properly been calculated at 27-33 months).[6]

### VII.    Now That Mike and Cindy Have Been Convicted, Restitution and Probation Are an Appropriate and Severe Punishment.

The Hermans contend that the tax loss in this matter is $10,152.  This leads to a Base and Total Offense Level of 10, with a guideline range of 6-12 months.[7]  The government contends that the tax loss in this matter is $551,329, leading to an Offense Level 20 and a sentencing range of 33-41 months in prison.  Regardless of what the Court determines the tax loss to be, the Hermans will be obligated to pay restitution to the federal government and to the State of Texas (to whom they owe a far greater amount due to penalties and interest based on state audits).  Mike Herman accepts that and he will pay what the Court determines he owes.  Mike Herman urges this Court—under the Guidelines but also under 18 U.S.C. § 3553(a)—that the appropriate

---

[6] Unlike the defendant *Taffaro*, Mr. Herman is not "powerful," "popular," or "well-connected."  *See Taffaro*, 919 F.3d at 949 (Judge Ho, concurring).  Moreover, the defendant Taffaro, a Sheriff's Chief Deputy, had committed tax evasion over a period of twelve years, in work directly related to his government connections with a partnership with the retired Sheriff of Jefferson Parish.  In contrast, Mike Herman rain a series of failed restaurants with his wife, Cindy.  They are now hundreds of thousands of dollars in debt.

[7] Even if the Court were to determine that the tax loss were nearly four times higher, up to $40,000, Herman would still be at a Base and Total Offense Level of 12, with a suggested range of 10-16 months.  This range also provides for the option of probation with home confinement under the Guidelines.

sentencing range in this matter is 10-16 months in Zone C. This can be satisfied by a sentence of probation, to include a period of home confinement or intermittent confinement.

This allows for a longer period of supervision than the supervised release available if Mr. Herman is imprisoned (five years vs. three years). It allows Mike to stay out and do what he has a lifelong track record of doing: working. He can work to pay off his restitution to the government and satisfy his debt to the Court and to society. Imprisonment will serve as a setback—not only to Mike and his family—but also to his ability to pay back the tax loss in this case.

Financial offenses in which individuals were not victimized do still need to be punished. The punishment of a lifelong felony conviction with all of its collateral consequence, a full order of restitution, and five years of probation—to include whatever period of home confinement or intermittent incarceration the Court believes is necessary—would be sufficient but not greater than necessary under 18 U.S.C. § 3553(a).

Respectfully submitted.

MAUREEN SCOTT FRANCO
Federal Public Defender

_____
/s/ DAVID M.C. PETERSON
Assistant Federal Public Defender
Western District of Texas
Lavaca Plaza
504 Lavaca St., Ste. 960
Austin, Texas 78701
(512) 916-5025
(512) 916-5035 (FAX)
Bar Number: California 254498

CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of August, 2019, I electronically filed the foregoing

Sentencing Memorandum with the Clerk of Court using the CM/ECF system which will send

notification of such filing to the following:

David Zisserson
U.S. Department of Justice
Tax Division
601 D. Street N.W.
Washington, DC 20004
202-514-6479
Email: david.zisserson@usdoj.gov

Robert Andrew Kemins
U.S. Department of Justice
Trial Attorney, Tax Division
717 North Harwood, Suite 400
Dallas, TX 75201
(214) 880-9781
Email: robert.a.kemins@usdoj.gov

Kevin D. Collins
Bracewell LLP
111 Congress Ave - Ste 2300
Austin, TX 78701
(512) 494-3640
Email: kevin.collins@bgllp.com

David Barton Springer
Bracewell LLP
111 Congress Avenue
Suite 2300
Austin, TX 78701
512-494-3617
Email: david.springer@bracewell.com

_____

/s/ DAVID M.C. PETERSON