## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-CR-0301-XR |
| | ) | |
| MICHAEL HERMAN | ) | |
| CYNTHIA HERMAN | ) | |
| | ) | |
| Defendants. | ) | |

## THE UNITED STATES' SENTENCING MEMORANDUM

The United States of America, in accord with 18 U.S.C. § 3553(a) and the United States Sentencing Commission Guidelines Manual, submits this memorandum for the sentencing of Defendants Michael and Cynthia Herman.

Following the government's Guidelines-based methodology to compute a tax-loss of $551,328.85, the Presentence Investigation Reports ("PSRs") calculate an offense level of 20, corresponding to a sentencing range 33 to 41 months' imprisonment.[1] The government requests the Court to sentence the defendants at the high-end of that range, in addition to ordering the defendants to pay $356,099 in restitution to the Internal Revenue Service.

The defendants – despite skimming at least a half-million dollars in cash from their businesses and using over $90,000 of corporate funds to pay personal expenses – insist that they caused only about $10,000 in tax loss and ask the Court to sentence them to probation. In other words: "no harm, no foul." The defendants' tax computations, however, are unreliable. In a self-serving fashion, they attempt to adjust purported accounting mistakes their CPA made without considering the other side of the ledger. In that regard, the defendants seek to reduce the

---

[1] Docs. 149 and 151.

tax loss by eliminating several categories of gross receipts without adjusting corresponding expenses that originally offset those revenues in the first place. Similarly, a decade after the fact, they now seek to deduct certain expenses they purportedly paid with personal funds – without accounting for, or acknowledging the existence of – other personal expenses they paid with business funds that the government did not present at trial. Therefore, taken as a whole, the defendants' calculations do not produce a reliable estimate of tax loss.

## BACKGROUND

In this criminal tax case, the jury returned guilty verdicts against Michael and Cynthia Herman on six out of the seven charged counts. Specifically, the defendants were both convicted on one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371, and two counts of filing false IRS Forms 1040, U.S. Individual Income Tax Returns, in violation of 26 U.S.C. § 7206(1), for 2010-2011. Michael Herman was convicted on an additional three counts in violation of Section 7206(1) for filing false Forms 1120, U.S. Corporation Income Tax Returns, for 2010-2012. The jury acquitted the defendants on one Section 7206(1) count related to their joint Form 1040 for 2012.[2]

The PSRs detail the evidence the government presented at trial, the fundamentals of which the defendants do not dispute. In summary, the defendants conspired to underreport their income from three restaurants they owned and operated. The defendants opened their first restaurant, Cindy's Gone Hog Wild, in 2005, incorporating it under the same name, and reporting its income on IRS Forms 1120. In 2009, they opened two other restaurants in Bastrop,

---

[2] Doc. 138.

17893238.1

Texas: Cindy's Downtown and Hasler Brothers Steakhouse, both operating under Cindy's Downtown, LLC, and reporting their income on the Hermans' Forms 1040.[3]

From 2007 to 2012, the defendants substantially underreported their restaurants' gross receipts and over-reported their expenses. First, they skimmed a portion of their businesses' cash receipts while falsely representing to their CPA, Greg Peden, that all cash receipts were deposited in their business bank accounts. The IRS's analysis of the defendants' point-of-sale ("POS") system and bank accounts revealed that they skimmed $568,479 in cash sales that they recorded in their POS system, but concealed from Peden by failing to deposit them. The evidence also showed that the defendants skimmed other sales they did not record in their POS system. Indeed, Mr. Herman admitted to an undercover agent that such funds totalled $7,500 to $10,000 per month.

Second, the defendants routinely used business funds to pay for personal expenses.[4] The evidence at trial showed that they deducted specific personal expenses in the amount of $94,387 – such as payments to their nanny – on their businesses' tax returns. As explained in further detail below, the government calculates that all of this conduct caused a tax loss of $356,099.

But, the defendants caused other tax losses that the Court should consider as relevant conduct. First, as they underreported their gross receipts to the IRS, they underreported their sales to the State of Texas as well. After two separate audits, the state assessed an additional $107,399 in sales taxes and food and beverage taxes against the defendants for 2009 to 2012. Second, the United States estimates that the defendants caused their payroll company, Pacesetter

---

[3] PSRs at ¶¶ 7-8.
[4] *Id.* at ¶¶ 9-13.

17893238.1

Personnel Services, to underpay $87,831 in employment taxes by underreporting the tips their

employees earned.  The government's tax loss computations are explained in more detail below.

**DISCUSSION**

I.    **TAX LOSS SHOULD BE CALCULATED USING THE STANDARD METHOD THE GUIDELINES SET FORTH.**

      a.  **The Government's Guidelines-Based Calculation.**

Sentencing for tax crimes depends mostly on the tax loss the defendant caused.  *See*

U.S.S.G. § 2T1.1.  The Sentencing Guidelines provide that to calculate tax loss: "If the offense

involved filing a tax return in which gross income was underreported, the tax loss shall be treated

as equal to 28% of the unreported gross income (34% if the taxpayer is a corporation) plus 100%

of any false credits claimed against tax, unless a more accurate determination of the tax loss can

be made."  U.S.S.G. § 2T1.1(c)(1), Note A.  The Guidelines provide the same method for

offenses involving improperly claimed deductions.  *Id.* at Note B.

The government's tax-loss calculation uses that method the Guidelines prescribe: the

defendants' underreported gross receipts and improperly-claimed expenses are multiplied by the

specified percentages.  Attached hereto are the summaries the government presented at trial of

the defendants' undeposited cash receipts and use of business funds for personal expenses.[5]

From 2007-2012, the defendants skimmed a total of $568,479[6] in cash receipts from their

businesses and paid $94,387 in personal expenses with business funds.  Using the percentages

the Guidelines set forth, the tax loss associated with this conduct is as follows:

---

[5] *See* Attachment 1, Summary of Undeposited Cash Receipts (Government's Trial Exhibit 31); Attachment 2, Summary of Personal Expenses Paid and Deducted (Government's Trial Exhibit 42).
[6] This is slightly lower than the figure the government presented at trial.  After trial, the government agreed to reduce the number for sentencing based on two errors defense counsel discovered.

17893238.1

| Entity | Source of Income | | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | Total |
|---|---|---|---|---|---|---|---|---|---|
| CGHW | | Form 1120 | | | | | | | |
| | Omitted Cash Receipts | 34% | $10,585 | $18,839 | $16,910 | $12,474 | $7,340 | $13,342 | $79,489 |
| | Personal Expenses Paid | 34% | $3,398 | $2,270 | $4,401 | $7,120 | $6,304 | $6,487 | $29,979 |
| | | | | | | | | | **$109,468** |
| Downtown | | Form 1040 | | | | | | | |
| | Omitted Cash Receipts | 28% | | | $25,039 | $27,588 | $13,735 | $27,351 | $93,713 |
| | Personal Expenses Paid | 28% | | | $141 | $800 | $777 | | $1,719 |
| | | | | | | | | | **$95,431** |
| | | | | | | | | | |
| | | | | | | | | **Total** | **$204,899** |

The figures the government presented at trial, however, addressed only skimmed cash from sales that the defendants actually recorded in their POS system. For sentencing, however, the government has estimated the tax loss resulting from cash sales the Hermans did not record in their POS system. In a conversation recorded with an undercover IRS agent on June 5, 2013, Mr. Herman stated:[7]

| 18 | D. RAMIREZ: | Well as I, as I'm … I guess as I'm running my numbers here can I just assume that |
| 19 | | I can add in another seventy-five hundred dollars a, a month that, you know, |
| 20 | | doesn't get rung up and I can add it to my calculations of what? |
| 21 | M. HERMAN: | Yes, sir. |
| 22 | D. RAMIREZ: | I can? |
| 23 | M. HERMAN: | Pretty 5 … 75 or ten grand. |
| 24 | D. RAMIREZ: | Okay, 75, ten grand. |
| 25 | M. HERMAN: | Seventy-five hundred and ten thousand dollars. But again I mean, uh, and I, I'm |

The defendants argue that the Court should not actually believe Mr. Herman's estimate here. In other words, under the defendants' interpretation: he provided false information to a potential buyer of his businesses to induce him to buy them. So, according to the defendants, the Court should believe Mr. Herman now when he says he was lying back then.

---

[7] *See* Attachment 3, Excerpts from Undercover Records, at 1 (page citations to this attachment refer to the page of the attachment itself, not the page numbers at the bottom of the transcripts).

17893238.1

But, that is not the only time Mr. Herman discussed sales that were not recorded in the POS system. First, in a meeting on May 30, 2013, he implied that he knew how to avoid recording cash sales:[8]

| 2 | D. RAMIREZ: | Well some of that cash though gets rung up in the point of sales system, right? |
|---|---|---|
| 3 | M. HERMAN: | Yeah, but you could. |
| 4 | C. HERMAN: | Yeah. |
| 5 6 | M. HERMAN: | There's ways to manipulate that and to where it just doesn't even ... doesn't happen. You can ... the good thing about these POS systems. |

Then, *immediately* after that exchange, the undercover recording captured Mr. Herman specifically instructing an employee not to record cash beer sales in the POS system. The employee asks: "But is, um, should we all do a register at a trough or [inaudible]?" At first, Mr. and Mrs. Herman state that she should "ring up beers." But, in short order, Mr. Herman decides that only food sales – not beer – should be recorded:[9]

| 1 2 | M. HERMAN: | Well if you're going to do that, just put a [inaudible] on her. If all she's going to do is beers, she's not going to order food? |
|---|---|---|
| 3 | C. HERMAN: | And just do a cash, cash? |
| 4 | M. HERMAN: | Yeah. Just do a cash, yeah. |
| 5 | C. HERMAN: | Okay. |
| 6 | M. HERMAN: | Absolutely. |
| 7 | C. HERMAN: | So we're not going to do that. |
| 8 | FEMALE: | So we're just going to do [inaudible] and everything else? |
| 9 10 | M. HERMAN: | Did it go good last ... or right there at the service station. Order the food to service station. |
| 11 | C. HERMAN: | Service station and the bar. You all can. |
| 12 13 | M. HERMAN: | So whoever's on the trough, direct them to the service station if they want to order food. |

---

[8] *See* Attachment 3 at 2-3.
[9] *Id.* at 3-4.

17893238.1

Later, during a conversation on August 8, 2013, Mr. Herman describes the information available through the POS system. When the undercover agent asks, Mr. Herman states that beer-trough sales are not recorded in the system:[10]

| 22 | D. RAMIREZ: | Well what if you have one of those trough deals, is that in there too then? |
|---|---|---|
| 23 | M. HERMAN: | Trough deals? |
| 24 | D. RAMIREZ: | Like, uh, let's say you just have a trough out there with beer and there's cash. |
| 25 | M. HERMAN: | No. That's not going to be in there. |
| 26 27 28 | D. RAMIREZ: | Yeah, see I. So I, I know this place does better than what the paper says it does. I just, I don't know how ... I don't know how much. That's the thing I don't, I don't know. |
| 29 30 31 32 | M. HERMAN: | Again, the only way you're going to ... I mean the best way to find ... I mean the only way we're going to find out, Dan, is when you get in here and work it whether you own it or you just come in and work it. Uh, you know, again those trough nights, those are going to be on your really busy nights. |

Then, on that same day, Mr. Herman specifically describes the origins of his decision not to record certain sales in the POS system:[11]

| 29 30 31 32 33 | M. HERMAN: | And they're ringing up cash. You're going to get in trouble. You're going to get in trouble. So that's ... it's, it's one reason why I'm glad we have a POS system, uh, other than a trough. Uh, the first time we ever did that, first time we ever did troughs, we took those numbers that we sold in the trough and went over and entered them into the register. We had an actual count of exactly what we're |
| 1 2 | | doing. Then we started thinking wait a second, that's cash money. It's cash money so, uh. |

Mr. Herman made clear, therefore, that the defendants did not record certain cash sales at their restaurants in their POS system. Of course, the very nature of that practice makes it impossible to arrive at a precise number of revenues the defendants collected this way. But, Mr.

---

[10] *Id.* at 5.
[11] *Id.* at 6-7.

17893238.1

Herman himself – when he did not realize he was speaking to law enforcement – estimated such sales to total $7,500-$10,000 per month.

To calculate the tax loss associated with those unrecorded sales, the government used the low end of Mr. Herman's estimate: $7,500 per month. Also, because it is unclear what portion of those sales are attributable to either the defendants' corporation or their LLC, the government applied the lower Guidelines tax rate to the entire figure: the 28% applicable to income reported on a Form 1040, as opposed to income reported on a corporate tax return. Accordingly, the government's calculation of the loss associated with the unrecorded sales is as follows:

| Income ($7,500 per month) | Form 1040 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Cash Receipts not Rung Up | 28% | $25,200 | $25,200 | $25,200 | $25,200 | $25,200 | $25,200 | **$151,200** |

### b. The Defendants' Tax-Loss Calculations Produce an Unreliable Figure.

The Guidelines state that tax loss should be calculated using the method employed above "unless a more accurate determination of the tax loss can be made." U.S.S.G. § 2T1.1(c)(1), Note A. In cases where tax loss is uncertain, "the guidelines contemplate that the court will simply make a reasonable estimate based on the available facts." *Id.* at Application Note 1; *United States v. Pesaturo*, 476 F.3d 60, 73 (1st Cir. 2007). There is inherent uncertainty in calculating tax loss in a case like this. By the very nature of the defendants' crimes, they concealed their businesses' true revenues and expenses, making it extremely difficult, years later, to arrive at a precise tax-loss figure. Therefore, it is reasonable to use the default method the Guidelines set forth.

The defendants' calculation – estimating tax loss to be only about $10,000 – is not more accurate. The defendants' CPA, Greg Peden, prepared their tax returns based on the information they provided. Now, years later, the Hermans seek to cherry-pick allegedly incorrect items from their accounting records to compute a more favorable tax loss. The defendants, however, are

8

only looking at one side of the ledger. The primary foundation for their figures is the work their expert William Brown performed for trial. But, Mr. Brown's work was not designed to calculate a bottom-line tax figure. Rather, as stated in the defendants' expert disclosure, Mr. Brown: (1) "relied on accounting principles in order to arrive at a correct revenue figure;" and (2) "also analyzed business expenses paid with personal funds."

Neither of those analyses is sufficient to arrive at a reasonable estimate of tax loss. Regarding gross receipts, Mr. Brown's work was not designed to take into account various expenses that offset many of the allegedly misclassified gross receipts. Similarly, even if the defendants did spend personal funds on the business expenses they have now compiled, they are ignoring other personal expenses they paid with business funds in addition to the ones the government presented at trial. Therefore, allowing the defendants to decrease tax loss by selectively identifying only transactions in their favor does not result in a more accurate tax loss computation than the default Guidelines method the government used.

### i. The defendants' adjustments to gross receipts ignore corresponding expenses that offset the allegedly-erroneous accounting.

The defendants, years after the fact, have identified a series of items they believe CPA Peden incorrectly classified as gross receipts on their tax returns. Even if they are correct, the defendants either ignore or misunderstand the other side of the ledger, i.e., other accounting entries Peden made that offset many of these revenues, rendering any alleged error tax-neutral.

An easy-to-understand example of this problem is the defendants' attempt to eliminate from gross receipts a loan from Mr. Herman's mother. The government agrees that classifying such a loan as revenue is incorrect. But, as the evidence showed at trial, the defendants paid Mr. Herman's mother for her investments in their businesses by placing her on regular payroll, even though she did not actually work there. As a result, all paychecks for her "wages" were –

17893238.1

unbeknownst to Peden – improperly deducted as business expenses. That accounting on the expense side would offset any incorrect accounting on the revenue side. Therefore, one cannot simply eliminate purportedly erroneous gross receipts without fully analyzing the expenses side of the ledger. The defendants have not done this.

Similar, albeit more complicated, situations arise with many other revenue items the defendants seek to eliminate. A significant number of those adjustments pertain to Peden's treatment of loans the defendants received from a company called Advance Me, from which they borrowed funds to be repaid with a percentage of future credit card receipts. Apparently, when the proceeds from those loans were received, they were recorded as revenues, rather than loans. The defendants' analysis ends there. It should not, because Peden deducted the payments on those loans – both principal and interest – as expenses. This may not be consistent with generally accepted accounting principles. Nonetheless, it was essentially (other than a potential timing difference) a tax-neutral event: what was accounted for as revenue was offset with corresponding expenses. Therefore, simply subtracting the loans from gross receipts – as the defendants seek to do – without unwinding the entire set of transactions, does not contribute to a reliable estimate of tax loss.

Likewise, a significant portion of the gross receipts the defendants seek to eliminate pertain to payments they received from Bastrop Properties, which leased them the property for one of their restaurants. The defendants identify deposits from Bastrop Properties that they claim Peden incorrectly classified as gross receipts. Again, even if the defendants are right, they ignore the corresponding expense-side of the ledger which demonstrates that this was a tax-neutral event. Bastrop Properties provided the funds in question as reimbursements for leasehold improvements. Peden treated those leasehold improvements as assets and capitalized them.

17893238.1

Correspondingly, Peden depreciated those improvements as expenses over time.  Therefore, even

if the deposits from Bastrop Properties should not have been gross receipts, the accounting

treatment of this set of transactions (again, other than a potential timing difference) does not

affect the taxes the defendants owe.

Moreover, in many circumstances, Peden made aggregate adjusting journal entries to

decrease gross receipts to account for items that should not have been considered revenue.  A

decade later, it is difficult to determine exactly what specific transactions these entries are meant

to adjust.  Nonetheless, the defendants' analysis often ignores them altogether.  In other words, if

Mr. Brown could not determine why Peden made certain adjustments, he added those

adjustments to his own.  This probably results in a large amount of double-counting.

At the very least, the defendants' attempt to reconstruct their companies' accounting

records years after the fact is exactly what the Guidelines' method of computing tax loss is

designed to prevent.  It serves as a reasonable estimate of tax loss when something more accurate

cannot be accomplished.  *See United States v. Spencer*, 178 F.3d 1365, 1368 (10th Cir. 1999)

("neither the government nor the court has an obligation to calculate tax loss with certainty or

precision").  That is the case here.

### ii.  *The defendants' attempt to offset their use of business funds for personal expenses ignores additional personal expenses they paid with business funds that the government did not present at trial.*

The defendants have identified a series of business expenses they paid with personal

funds they claim should have been deducted as business expenses for tax purposes.  But here,

they again fail to account for the opposite side of the ledger: *all* personal expenses they paid for

with business funds.  Although the government proved that the defendants deducted various

categories of personal expenses as business expenses, they deducted even more personal

17893238.1

expenses than what the government presented at trial.  The defendants – who are best-suited to identify all such expenses – have not done so.

The government has already shown that the Hermans spent over $90,000 of business funds on personal expenses from 2007-2012.  These personal expenses included utility bills, mortgage payments, and their nanny's salary.[12]  As the evidence showed at trial, however, Mr. Herman blurted out to the undercover agent, without prompting: "But you, you're aware . . . there are some things that, that, you know, what we were doing in 2008 is that it was paying for our cars or house, ins –.  We had no expenses.  The business was paying for, for everything."[13]

So, for sentencing, after a relatively surface-level review of the defendants' records, the government discovered other personal expenses the Hermans paid with business funds. Specifically: internet service at their house; satellite and cable television at their house; mobile telephones for themselves and their children; auto insurance; and car payments.  That is in addition to smaller payments for expenses that, on their face, appear personal:  Dillard's, Neiman Marcus, and Macy's.  And these are only the items that are apparent without further investigation.  It is reasonable to conclude that the personal expenses the government discovered only scratch the surface.

This makes the defendants' identification of new business expenses an inherently dishonest endeavor.  They should not be allowed to use their insider knowledge to cherry-pick items that advantage them without, again, accounting for the other side of the ledger.  With the likelihood that the defendants used business funds for so many more personal expenses than the

---

[12] *See* Attachment 2.
[13] Attachment 3 at 8.

17893238.1

government can reasonably discover, their belated accounting for other business expenses does not result in a reliable tax loss figure.

### iii. The Court should not exclude 2012 from the tax-loss calculations because of the defendants' acquittal on Count 4 of the Indictment.

The defendants argue that, because they were acquitted on Count 4 of the Indictment, failing a false Form 1040 for 2012 in violation of 26 U.S.C. § 7206(1), the Court should exclude from sentencing the tax loss related to 2012. This, however, ignores that the defendants were convicted of a conspiracy that included 2012. It also ignores the evidence showing that during 2012, they committed the same conduct to cheat on their taxes as they did in previous years. Indeed, Mr. Herman was convicted on Count 7 for filing a false 2012 Form 1120 for Cindy's Gone Hog Wild, Inc.

The only difference in the evidence for 2012 is that the government was unable to present a signed Form 8879 to prove Section 7206(1)'s element that the defendants "subscribed" the return. Otherwise, their conduct in skimming cash receipts and paying personal expenses with business funds was the same as in all other years. Therefore, the Court should include 2012 in the tax-loss calculation. *See generally United States v. Watts*, 519 U.S. 148, 157 (1997) (Guidelines range may rest on uncharged conduct or conduct underlying acquitted charges, if the court finds conduct proven by a preponderance of evidence).

## II.   RELEVANT CONDUCT

### a. State Tax Losses

The evidence at trial proved that the defendants underreported their business income on the tax returns they filed with the IRS. It is not surprising therefore, that during the same time period, they underreported their sales to the State of Texas as well. Indeed, the Texas

17893238.1

Comptroller of Public Accounts audited the Hermans' businesses and assessed additional general sales taxes and mixed beverage sales taxes as follows:

| Sales Tax | January of 2009 – August of 2012 | | | | $76,747 |
| Mixed Beverage Tax | March – December of 2012 | | | | $30,651 |
| | | | | Total | $107,399 |

The Court should include those underreported state taxes as relevant conduct under U.S.S.G. § 1B1.3.  Filing false sales tax returns is a crime under the Texas Code.  *See* Tex. Tax Code § 151.7102 ("A person commits an offense if the person intentionally or knowingly conceals, destroys, makes a false entry in, or fails to make an entry in records that are required to be made or kept under this chapter.").  And, as the Fifth Circuit made clear in *United States v. Powell*, 124 F.3d 655, 665-66 (5th Cir. 1997), state taxes evaded by a defendant qualify as relevant conduct to be included in tax loss where evasion of state and federal taxes occurred at same time, was based on the same conduct, and was not isolated or sporadic.

That is the case here.  The defendants' underreporting of gross receipts to the state occurred at the same time they were underreporting gross receipts to the IRS.  In addition, as proven at trial, the defendants' conduct was anything but isolated or sporadic.  Therefore, the Court should include the defendants' state sales tax deficiencies as relevant conduct in calculating their base offense level.

The defendants complain, however, that the state sales-tax audit was inaccurate.  They state in their objections to the PSR: "The state auditor's methodology, which was similar to that of the Hermans' former CPA Greg Peden, utilized a crude analysis of bank deposits, which did not account for deposits that were not, in fact, sales."

The defendants fail to mention that how the state auditor testified at trial that Mr. Herman lied to him about the availability of POS records.  Mr. Herman told him that the records were lost

14

in a fire when, of course, they were not: the IRS located scores of POS records in electronic and paper format during the execution of its search warrants. If state auditors had to make certain assumptions to compensate for the lack of records, that is the defendants' own fault. The very nature of their fraud made it difficult to determine their businesses' true income. As discussed above, even the POS records do not reflect all of their restaurants' revenues. Therefore, there are any number of reasonable methods that could have been used to estimate their gross receipts. Now, years later, is not the time to relitigate the specifics of the state audit. Therefore, the Court should consider the state's full tax assessments as relevant conduct.

### b. Federal Employment Taxes

At the same time the defendants were underreporting their income to the IRS, they were also underreporting their employees' wages to their payroll company, Pacesetter. This caused Pacesetter to significantly underreport the employment taxes associated with the defendants' staff. The defendants claim that the Court should not consider this relevant conduct because they did not benefit from it. That is not true. The defendants paid Pacesetter a percentage of their payroll.[14] Therefore, by underreporting payroll, the defendants saved a significant sum of money.

In any event, the defendants always reported their employees' tips to Pacesetter as 8% of their sales, regardless of what the tips actually were. The defendants, however, were fully aware of the real amount of tips: their POS system recorded it and they issued their employees checks for credit card tips. In that regard, the defendants knew that their employees' tips averaged 17%-

---

[14] *Id.* at 9.

17893238.1

20% of sales. Still, every pay period, they reported to Pacesetter tips of only 8%. They also fully understood the tax implications of this:[15]

| 17 | M. HERMAN: | So hours here, this is the 8% of their sales. |
|---|---|---|
| 18 | D. RAMIREZ: | Okay. |
| 19 | M. HERMAN: | Cause they have to show that on their W-2. |
| 20 | C. HERMAN: | 8% of their sales. |
| 21 | M. HERMAN: | Show it on the check they made that. |
| 22 23 | C. HERMAN: | Yeah, and so all they get at the end of the year is a W-2 from Pacesetter saying this is how much you made, this is how much your tips. |
| 24 | D. RAMIREZ: | Right. |
| 25 26 | C. HERMAN: | Your, your credit ... your tips were, 8% of your sales. And they don't have to dole out anything else. |
| 27 | M. HERMAN: | Yeah. It's cut and dry, simple. |

The defendants claim that this was just a misunderstanding; they believed the minimum the IRS required to be reported of 8% was *all* they had to report. The Court should not believe that excuse. It is clear from the conversation above and the additional excerpts from the transcript attached hereto that the Hermans knew: (1) what their employees' tips actually were, (2) that they were reporting less than the actual tips, and (3) that the incorrect amount they reported would wind up on their employees' W-2s.

    Indeed, given the defendants' other behavior, it is not hard to believe that they would intentionally cut this corner to save themselves money. The defendants committed such conduct over and over. For example, during a conversation with the undercover agent, Mr. Herman admitted to skirting a state rule that alcohol sales cannot exceed 51% of total sales. He explained: "So what we do is we comp an extra $8,000 worth of food . . . I'm basically giving the state an extra $800 a month and showing that I'm comping, you know, 8,000, 9,000 worth

---

[15] *Id.* at 10-13.

17893238.1

of food that's not even. . . doesn't exist so we can stay in business and sell our alcohol because that corner will sell alcohol."[16]

Underreporting employees' tips was therefore part and parcel of the defendants' standard behavior. The Court should include the tax loss associated with that as relevant conduct. Using the low-end of the average tips that the Hermans stated of 17% of sales, the government has estimated the loss associated with this behavior as follows:

| Payroll (17% Tips) | Tax Rate | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | Total |
|---|---|---|---|---|---|---|---|---|
| CGHW | 15.30% | $12,254 | n/a | n/a | $9,677 | $3,371 | $10,246 | $35,548 |
| Downtown | 15.30% | n/a | n/a | n/a | $9,524 | $13,434 | $11,708 | $34,666 |
| Hassler's | 15.30% | n/a | n/a | n/a | $5,694 | $5,848 | $6,076 | $17,618 |
| | | | | | | | | **$87,831** |

## III.    CYNTHIA HERMAN DID NOT PLAY A MINOR ROLE IN THE CRIMES.

Cynthia Herman seeks a 3-point subtraction from her Guidelines level for being a minor participant in the crime. Just because she did not interact with the Hermans' CPA in the preparation of their tax returns does not mean that she did not play an equal role in the crime. The evidence showed that she signed numerous checks to pay personal expenses with business funds, coding those checks with specific accounting classifications for business expenses. Moreover, she was in charge of the businesses' payroll and, as such, completed forms every pay period to include her nanny and her mother-in-law in payroll, knowing full well that neither of them actually worked for the restaurants. In addition, Mrs. Herman's statements to the undercover agent reflect complete understanding of the tax consequences of her actions.[17] Therefore, Mrs. Herman is not entitled to an adjustment to her base offense level for her role in the crimes.

---

[16] *Id.* at 14.
[17] *Id.* at 15-16.

17893238.1

## IV.    THE COURT SHOULD IMPOSE A SENTENCE AT THE UPPER END OF THE GUIDELINES RANGE.

The defendants' conduct was not the result of a temporary lapse of judgment.  Rather, it was a consistent series of deliberate acts over at least a 6-year period designed to avoid a significant portion of their federal tax obligations.  Under the factors set forth in 18 U.S.C. § 3553(a), a sentence in the highest level of the Guidelines range is appropriate.  Indeed, such a sentence is necessary "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment."  18 U.S.C. § 3553(a)(2)(A).

Moreover, an upper-level Guidelines sentence is necessary to "afford adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2)(B).  As the Eighth Circuit has explained, "willful tax evaders often go undetected such that those who are caught . . . must be given some term of imprisonment.  The goal of deterrence rings hollow if a prison sentence is not imposed[.]" *United States v. Ture*, 450 F.3d 352, 358 (8th Cir. 2006); *United States v. Saldana*, 427 F.3d 298 (5th Cir. 2005).  Likewise, the Sentencing Commission's policy statement on tax prosecutions makes clear that the primary purpose of tax prosecutions is general deterrence.  The introductory paragraph to income tax offenses in the Guidelines states:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system.  Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws.  Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines.  Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. Manual, Chapter 2, Part T, Introductory Commentary (2018).

In that regard, general deterrence is an essential means of minimizing the ever-increasing amount of money estimated to be lost each year through tax fraud.  The United States tax system relies on voluntary compliance.  IRS studies have estimated that only 81.7% of individuals are

18

17893238.1

compliant, leaving a yearly tax gap of hundreds of billions of dollars in unreported and

uncollected taxes.[18]  According to Joshua Blank, Associate Professor of the Practice of Tax Law

and Faculty Director of the Graduate Tax Program, New York University School of Law,

"[s]tudies have shown that salient examples of tax-enforcement actions against specific

taxpayers, especially those that involve criminal sanctions, have a significant and positive

deterrent effect."[19]  These studies emphasize the impact that noncompliance with the tax code

has on the U.S. Treasury and the deterrent effect prison sentences have on other potential tax

violators.

At the same time, the significant resources required to mount a criminal tax prosecution

results in relatively few such prosecutions each year.[20]  Where the incidence of prosecution is

lower, the level of punishment must be higher to obtain the same level of deterrence.[21]

Thus, to provide adequate general deterrence, the sentence imposed by the Court in this

case must be significant.  The government cannot ensure compliance with the Internal Revenue

Code if the general public believes there are no serious repercussions for committing tax crimes.

Sentencing the defendants to an upper-Guidelines sentence will send a message to others that any

systematic effort to cheat on one's taxes will be met with serious punishment.

---

[18] *See* IRS's "Tax Gap Estimates for Tax Years 2008 – 2010" https://www.irs.gov/uac/the-tax-gap; *see also United States v. Gardellini*, 545 F.3d 1089, 1097 (D.C. Cir. 2008).
[19] Joshua D. Blank, In Defense of Individual Tax Privacy, 61 Emory L.J. 265, 322 (2011).
[20] According to U.S. Sentencing Commission statistics published August 2019, (https://www.ussc.gov/research/quick-facts/tax-fraud), in fiscal year 2018 there were only 517 tax fraud offenders sentenced nationwide. This represents less than one percent of all federal cases reported to the Sentencing Commission in 2018, and 81 fewer tax offenders than were sentenced in fiscal year 2017.
[21] *See generally*, Louis Kaplow and Steven Shavell, Fairness Versus Welfare, 114 Harv. L. Rev. 961, 1225-1303 (2001).

17893238.1

The need for specific deterrence is also present in this case.  Here, we are dealing with defendants whose tax crimes span at least 6 years.  Their unwavering commitment to tax fraud is evidenced by the various means they employed to accomplish it and their braggadocios attitude about it, more or less boasting to whom they believed to be a potential buyer of their restaurants.  As discussed at trial, Mr. Herman even lied to the case agent when interviewed, stating that all receipts were deposited into the restaurants' bank accounts.

Moreover, after the IRS executed a search warrant – i.e., after the defendants had essentially already been caught – they were still willing to publically express venom about tax-enforcement authorities.  The government has previously brought to the Court's attention statements the defendants wrote in their book about the restaurant business:

- "Most tax people I have had the pleasure of dealing with, could not get a real job or couldn't do half of what you do.  They work for the government and suck on the government's tit."

- "I believe these are people who do not like successful people and are more of the type who could not get what I call a real job."

-  "When dealing with auditors, it is best to try to get these blood-sucking bimbos the information they want and get them out of your business."

- "I also believe the IRS agents are more of the people who cannot go out and get a real job so they go to work for the government."

Even after being convicted at trial, the defendants still argue, in effect, that they did not cause any harm.  They argue that they caused only $10,000 in tax loss and deserve only probation.  It appears that they will not appreciate the nature of their crimes unless the Court makes a serious example out of them.

17893238.1

V.    THE SENTENCE SHOULD INCLUDE AN ORDER OF RESTITUTION.

As discussed above, the Hermans' conduct resulted in a total of $356,099 in federal tax

harm, excluding the relevant conduct of the employment tax underpayment.  The Court should

order them to pay that amount as restitution to the IRS.

The Mandatory Victim Restitution Act of 1996, codified as amended at 18 U.S.C. §

3663A, makes restitution for certain crimes, including certain tax crimes under Title 18,

mandatory.  As 18 U.S.C. 3663A(a)(1) states, "the court *shall order*, in addition to . . . any other

penalty authorized by law, that the defendant make restitution to the victim of the offense . . . ."

(emphasis added).  The offenses to which the MVRA applies include offenses against property

and any offense committed by fraud or deceit.  In addition, the offense must be one in which an

identifiable victim, or victims as the case may be, has suffered a physical injury or pecuniary

loss. 18 U.S.C. § 3663A(c)(1)(B).

Although the MVRA does not apply to criminal violations of Title 26, the MVRA does

apply to criminal tax cases involving violations of Title 18 when the offenses are committed by

fraud or deceit and are offenses against property, such as conspiracy to defraud the United States

or to commit tax fraud, in violation of 18 U.S.C. § 371.  *See United States v. Turner*, 718 F.3d

226, 235-36 (3d Cir. 2013) (holding that MVRA required sentencing court to order restitution in

case involving *Klein* conspiracy); *United States v. Senty-Haugen,* 449 F.3d 862, 865 (8th Cir.

2006) (district court properly ordered defendant convicted of conspiracy to defraud the

government to pay restitution to the IRS); *United States v. Kubick*, 205 F.3d 1117, 1128-29 (9th

Cir. 1999) (mandatory restitution ordered on convictions for conspiracy to commit bankruptcy

fraud and conspiracy to impede and impair the Internal Revenue Service, each in violation of 18

U.S.C. § 371).  Accordingly, the Court should order the defendants to pay restitution.

21

**CONCLUSION**

For the reasons stated above, the United States requests the Court to sentence defendants

Michael and Cynthia Herman at the upper end of the Guidelines range of 33 to 41 months'

imprisonment, and to pay restitution to the IRS in the amount of $356,099.


Dated: August 30, 2019                          Respectfully submitted,

                                                JOHN F. BASH
                                                UNITED STATES ATTORNEY
                                                WESTERN DISTRICT OF TEXAS

                                                /s/ David Zisserson
                                                DAVID ZISSERSON
                                                D.C. Bar No. 493772
                                                Trial Attorney
                                                U.S. Dept. of Justice, Tax Division
                                                150 M Street, N.E.
                                                4 Constitution Square
                                                Washington, D.C.  20002
                                                (202) 514-6479
                                                David.Zisserson@usdoj.gov

                                                ROBERT A. KEMINS
                                                Massachusetts Bar No. 267330
                                                Trial Attorney
                                                U.S. Dept. of Justice, Tax Division
                                                717 N. Harwood, Ste. # 400
                                                Dallas, TX 75201
                                                (214) 880-9781
                                                Robert.A.Kemins@usdoj.gov

17893238.1

**CERTIFICATE OF SERVICE**

I certify that on this 30th day of August, 2019, I electronically filed the foregoing via the Court's ECF system, which will automatically provide notice of such filing via electronic mail to all counsel of record.

/s/ David Zisserson
Trial Attorney, Tax Division
U.S. Department of Justice

17893238.1